UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MICHAEL ALAN CROOKER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION |
| ) | NO. 18-30011-WGY |
| TRANSPORTATION SECURITY ) | |
| ADMINISTRATION and THE FEDERAL ) | |
| BUREAU OF INVESTIGATION, ) | |
| ) | |
| Defendants. ) | |

YOUNG, D.J.                                                July 26, 2018

**MEMORANDUM AND ORDER**

I.   **INTRODUCTION**

The Plaintiff, Michael Alan Crooker ("Crooker"), filed this action against the Transportation Security Administration ("TSA") of the Department of Homeland Security ("DHS") and the Federal Bureau of Investigation of the United States Department of Justice ("FBI" and collectively, the "Defendants") seeking a declaratory judgment that the Defendants' policies, practices and customs violate the United States Constitution and the Administrative Procedure Act.  Crooker also seeks an injunction to remedy such violations, including: (1) the removal of Crooker's name from any watch list or database that prevents him from flying, (2) a disclosure of the reasons and bases for his

inclusion on the federal government's "No Fly List," and (3) the opportunity to contest such inclusion before a live, neutral decision-maker.

The Defendants moved to dismiss the complaint pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure, asserting that the Court lacks subject matter jurisdiction on the action and that Crooker fails to state a claim upon which relief can be granted. In the alternative, the Defendants request that the Court stay proceedings in this case pending Crooker's exhaustion of his administrative remedies.

## A. Procedural History

Crooker filed his complaint on January 19, 2018, Compl., ECF No. 1, and later amended it on March 26, 2018, Am. Compl., ECF No. 38. On April 16, 2018, the Defendants filed a motion to dismiss the amended complaint, Defs.' Mot. Dismiss Am. Compl. ("Defs.' Mot."), ECF No. 43, along with a motion to stay, in the alternative, Defs.' Mot. Stay Am. Compl. ("Defs.' Mot. Stay"), ECF No. 45. Both motions were fully briefed. See Defs.' Mem. Law Supp. Mot. Dismiss ("Defs.' Mem. Dismiss"), ECF No. 44; Defs.' Mem. Law Supp. Mot. Stay ("Defs.' Mem. Stay"), ECF No. 46; Pl.'s Opp'n Defs.' Mot. Stay Am. Compl. ("Pl.'s Opp'n Stay"), ECF No. 47, Pl.'s Opp'n Defs.' Mot. Dismiss Am. Compl. ("Pl.'s Opp'n Dismiss"), ECF No. 48; Defs.' Reply Pl.'s Opp'n ("Defs.' Reply"), ECF No. 51.

After a motion session held on June 11, 2018, at which this Court took the matter under advisement, the parties filed additional briefs. See Defs.' Suppl. Mem. Mot. Dismiss & Mot. Stay ("Defs.' Suppl. Mem."), ECF No. 58; Pl.'s Reply Suppl. ("Pl.'s Suppl. Reply"), ECF No. 59.

**B.  Facts Alleged**

Crooker is a Massachusetts citizen residing in Southwick, Massachusetts, employed as a shuttle bus driver for LAZ Fly Airport Parking ("LAZ Fly"), located in Windsor Locks, Connecticut.  Am. Compl. ¶ 2.  He is an ex-offender released from a federal prison on March 15, 2017, to home confinement and then on August 22, 2017, released from home confinement.  Id. ¶ 5.  Crooker's convictions were: (a) mailing a threatening communication to an officer of the United States in violation of 18 U.S.C. § 876(c), a Class C felony, and (b) possession of an unregistered toxin in violation of 18 U.S.C. § 175b(c)(1), a Class D felony.  Id.  The threatening communication was sent from jail to a federal prosecutor.  Id.

The Defendants are the agencies of the United States.  Id. ¶¶ 3-4.  They are described more in detail in the section entitled "Statutory and Regulatory Background," infra.

LAZ Fly is a public sector company and is known as an "off-airport parking company," which has contractual arrangements with the Connecticut Airport Authority ("CAA") to shuttle

airline passengers.  Id. ¶ 8.  LAZ Fly hired Crooker as a
shuttle bus driver and he began work on July 13, 2017, at which
time his job duties included transporting airline passengers
between the three LAZ Fly parking lots on Ella Grasso Turnpike
and the public curb of the airport terminal.  Id. ¶ 7.

Crooker disclosed his federal conviction status in his LAZ
Fly hiring paperwork and included the name and phone number of
his federal probation officer, Jesse Gomes ("Gomes").  Id. ¶ 10.
Crooker's LAZ Fly superiors were aware that until August 22,
2017, Crooker was wearing a GPS ankle bracelet, which limited
his ability to stay late at night for overtime.  Id.

Gomes, concerned about Crooker's possible presence in the
restricted areas of the airport, sought clearance from the TSA
and spoke with Steven Blindbury ("Blindbury") at the TSA about
Crooker's employment driving airline passengers to and from the
public curb of the airport terminal.  Id. ¶ 11.  Blindbury
approved of the employment and assured Gomes that Crooker would
not have access to the secured areas of the airport and would be
working only in locations the general public may access, outside
the TSA security checkpoints.  Id.

On September 24, 2017, LAZ Fly informed Crooker that he
could no longer drive to the airport, and later, on or about
October 11, 2017, his job was terminated.  Id. ¶ 13.  Crooker
alleges that the above action was due to the disclosure of

[4]

information to LAZ Fly, which could only have originated from the TSA, stating that Crooker is on the federal No Fly List. Id. Crooker subsequently received a copy of a letter that states that he is on the No Fly List. Id.; see Letter from CAA Dep't of Public Safety, ECF No. 25.

Crooker contacted FBI Special Agent Richard Winfield ("Winfield"), who informed Crooker that the Terrorist Screening Center ("TSC") adds names to the No Fly List and instructed him that the only available remedy is to file a Traveler Redress Inquiry Program Form ("TRIP Form") with DHS. Id. ¶¶ 14-15. Crooker then filed a TRIP Form on October 13, 2017, complaining that he had been fired from his job due to the disclosure that he was on the No Fly List. Id. ¶ 16. DHS replied on October 20, 2017, stating that "[a]fter reviewing your inquiry, we have determined that it falls outside the scope of the DHS TRIP program. Therefore, we are closing your inquiry." Id. ¶ 17. In the following weeks, Crooker reached out multiple times to the TSA Contact Center, (specifically, to the email address "aviation.workers@dhs.gov"), as well as DHS, trying to obtain any information or response regarding his situation. Id. ¶¶ 18-23.

On November 14, 2017, Crooker received an email from the TSA stating that "TSA can neither confirm nor deny whether an individual is on a Federal watch list because this information

is derived from classified and sensitive law enforcement and intelligence information" and that Crooker's issue was beyond the TSA's jurisdiction.  Id. ¶ 24.

Crooker subsequently brought this action.

## C.   Statutory and Regulatory Background

### 1.   The Transportation Security Administration, the Federal Bureau of Investigation, and the Terrorist Screening Center

The TSA, as an agency within DHS, has the duty to secure all modes of transportation, including aviation security.  49 U.S.C. § 114(d).  The TSA is responsible for "day-to-day Federal security screening operations for passenger air transportation," id. § 114(e)(1), and for developing "policies, strategies, and plans for dealing with threats to transportation security," id. § 114(f)(3).  Congress directed the TSA to establish procedures for notifying appropriate officials "of the identity of individuals known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety." Id. § 114(h)(2).  This mandate requires the TSA, "in consultation with other appropriate Federal agencies and air carriers," id. § 114(h)(3), "to use information from government agencies to identify [travelers] who may be a threat to civil aviation or national security," id. § 114(h)(3)(A), and to "prevent [those individuals] from boarding an aircraft, or take other appropriate action with respect to that individual," id. §

[6]

114(h)(3)(B). The TSA may "issue . . . such regulations as are necessary to carry out [its] functions," id. § 114(l)(1), as well as "prescribe regulations to protect passengers and property on an aircraft," id. § 44903(b).

The FBI investigates and analyzes intelligence relating to both domestic and international terrorist activities, see 28 U.S.C. § 533, 28 C.F.R. § 0.85(l), and administers the TSC.

"The TSC is a multi-agency center administered by the [FBI] and is the U.S. Government's consolidated counterterrorism watchlisting component responsible for the management and operation of the Terrorist Screening Database, commonly known as 'the watchlist.'" Terrorist Screening Center, Frequently Asked Questions at 1 (last updated Jan. 2017) ("TSC FAQ"), https://www.fbi.gov/file-repository/terrorist-screening-center-frequently-asked-questions.pdf. The TSC "ensures the timely dissemination of terrorist identity information to screening partners such as the Department of State, [DHS], and federal, state, and local law enforcement to provide for the appropriate and lawful use of terrorism-related information." Id.

## 2. The Terrorist Screening Database and the No Fly List

The Terrorist Screening Database ("TSDB") is the government's "consolidated database containing sensitive law enforcement and national security information concerning the

identity information of those who are known to be or reasonably suspected of being involved in terrorist activities." Id. The procedure for submission of identity information for inclusion in the TSDB is known as the "watchlist nomination process." Id. at 2. Government agencies nominate individuals who may qualify for inclusion and submit those nominations to the National Counterterrorism Center. Id. If the identity information is credible and sufficient, it is passed to the TSC, which verifies it once more before adding the record into the TSDB. Id.

The No Fly List is a subset of the TSDB consisting of the names of individuals who pose a threat to civil aviation or national security. Id. "Inclusion on the No Fly List prohibits an individual from boarding a commercial aircraft that traverses" the airspace of the United States. Id.

TSA is able to identify such individuals through the "Secure Flight" program, see 49 C.F.R. § 1560, which requires covered aircraft operators to request the full name, gender, date of birth, and other information from passengers, and submit the data to TSA. Id. § 1560.101(a), (b). TSA then matches this information with that of any individuals "on Federal government watch lists who seek to travel by air." Id. § 1560.1(b). An aircraft operator may not issue a boarding pass or other authorization to enter a sterile area to an individual until TSA

informs the operator of the results of watch list matching for that individual.  Id. § 1560.105(b).

The No Fly List is statutorily protected as Sensitive Security Information ("SSI") pursuant to 49 U.S.C. § 114(r). See, e.g., Blitz v. Napolitano, 700 F.3d 733, 737 n.5 (4th Cir. 2012) ("The pertinent regulations deem the following to be sensitive security information that may not be publicly released: . . . the identities of individuals on no-fly and selectee lists[.]").  Still, such information may be shared lawfully with law enforcement partners, such as airport operators.  49 C.F.R. §§ 1520.7(a), 1520.11.  In some cases, such status may also be disclosed to United States citizens and lawful permanent residents who are denied boarding on a commercial aircraft, seek redress for that denial of boarding, and are determined to be appropriately on the No Fly List.  See Latif v. Lynch, No. 3:10-cv-00750-BR, 2016 WL 1239925, at *4-5 (D. Or. Mar. 28, 2016).

### 3. DHS Traveler Redress Inquiry Program ("DHS TRIP")

Congress obliged TSA to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system."  49 U.S.C. § 44903(j)(2)(C)(iii)(I).  Pursuant to this

authority, DHS established and administers DHS TRIP, through
which travelers may request the correction of any erroneous
information if they believe that they have been unfairly or
incorrectly delayed or denied boarding on an aircraft or
entering a sterile area as a result of TSA's watch list matching
program.  49 C.F.R. § 1560.201.  TSA promulgated regulations
governing the DHS TRIP process and allowing travelers to
initiate the redress process by submitting a redress inquiry
form.  Id. § 1560.205(b); see also DHS TRIP: One-Stop Travelers'
Redress Process, Department of Homeland Security (Nov. 4, 2016),
https://www.dhs.gov/one-stop-travelers-redress-process.  Upon
receipt of such an inquiry form, TSA will "review all the
documentation and information requested from the individual,
correct any erroneous information, and provide the individual
with a timely written response."  49 C.F.R. § 1560.205(d).

## II.  ANALYSIS

Crooker's amended complaint (deleting certain allegations
against individuals in Connecticut) was filed only to "comply
with the Confidential Settlement Agreement that disposed of the
Connecticut federal civil case and the Connecticut state FOIA"
case against the CAA.  Pl.'s Opp'n Dismiss 1.  "Under Rule
12(b)(6), the district court may properly consider only facts
and documents that are part of or incorporated into the
complaint; if matters outside the pleadings are considered, the

motion must be decided under the more stringent standards applicable to a Rule 56 motion for summary judgment." Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008).

### A.   Standard of Review

When considering motions to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjuncture, the complaint is open to dismissal." Securities & Exch. Comm'n v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

It is the plaintiff's burden to prove that subject matter jurisdiction exists. Aversa, 99 F.3d at 1209. Additionally, under Rule 12(b)(6), the Court will dismiss a complaint if it fail[s] to state "a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

### B.   Subject Matter Jurisdiction

Where citizens no longer enjoy the protections of a jury of their peers,[1] Congress not infrequently seeks to restrict access to the courts and reduce disparate outcomes by limiting judicial review to the more remote courts of appeals.  See, e.g., Real ID Act of 2005, Div. B, Pub. L. No. 109-13, 119 Stat. 302 (codified as amended in scattered sections of 8 and 49 U.S.C.); Enwonwu v. Gonzales, 438 F.3d 22, 33 (1st Cir. 2006) (discussing the implications of the Real ID Act).  So it is here.  Final actions of the TSA are reviewable only in the courts of appeals.  49 U.S.C. § 46110.

Not surprisingly, here the Defendants argue that Crooker's amended complaint must be dismissed because this Court does not have subject matter jurisdiction to hear the claims pursuant to section 46110 providing for exclusive review of TSA final actions in the courts of appeal.

---

[1] "[W]here a jury sits, there burns the lamp of liberty." Hon. William G. Young, Address at the Judicial Luncheon, Florida Bar's Annual Convention in Orlando (June 28, 2007).  Today, however, with administrative agencies constantly expanding their interpretation of the "public rights" exception to the right to a civil jury trial, see William G. Young, Review: The Missing American Jury, Law360 (Nov. 23, 2016) (decrying this encroachment), a citizen in dispute with the administrative state but rarely can count on the Seventh Amendment jury trial right.

A consequence of the erosion of the jury trial right may well be, as the text explains, a diminution in the ability to have access to the courts altogether.

The Defendants read the restrictive judicial review provision far too broadly.  In Mokdad v. Lynch, 804 F.3d 807 (6th Cir. 2015), the Sixth Circuit analyzed whether a challenge to placement on the No Fly List falls within section 46110's restrictive review provision.  Id. at 812-13.  The court ruled that the plaintiff's direct challenge to his placement by TSC on the No Fly List was a challenge to a TSC order, not a TSA order. Id. at 812.  The Sixth Circuit stated that:

> although Congress has given TSA the responsibility of
> establishing redress procedures for travelers who
> believe they have been wrongly included on the No Fly
> List, TSA does not determine who is placed on the No
> Fly List; TSC does. . . . TSC is administered by the
> FBI.  The fact that TSC is an interagency center that
> is staffed by officials from multiple agencies,
> including the FBI, DHS, Department of State, Customs
> and Border Protection, and also TSA, does not
> transform TSC's order placing an individual on the No
> Fly List into an order of the TSA.

Id.  See also Latif v. Holder, 686 F. 3d 1122, 1127 (9th Cir. 2012); Ibrahim v. Department of Homeland Sec., 538 F.3d 1250, 1254-56 (9th Cir. 2008); Abdi v. Wray, No. 2:17-cv-622-DB, 2018 WL 1940411, at *4 (D. Utah Apr. 23, 2018).

In sum, the Sixth Circuit concluded that the district court had subject matter jurisdiction as the plaintiff's action constituted a challenge to an order of the TSC, which was not an agency enumerated in the exclusive-review statute.  Mokdad, 804 F.3d at 812.  So here.  This Court has subject matter jurisdiction to decide this case.

### C.   Standing

As Justice Scalia explained in Lujan v. Defenders of
Wildlife, 504 U.S. 555 (1992):

> [O]ur cases have established that the irreducible
> constitutional minimum of standing contains three elements.
> First, the plaintiff must have suffered an "injury in fact"
> -- an invasion of a legally protected interest which is (a)
> concrete and particularized and (b) "actual or imminent,
> not 'conjectural' or 'hypothetical.'"   Second, there must
> be a causal connection between the injury and the conduct
> complained of -- the injury has to be "fairly . . .
> trace[able] to the challenged action of the defendant, and
> not . . . th[e] result [of] the independent action of some
> third party not before the court."   Third, it must be
> "likely," as opposed to merely "speculative," that the
> injury will be "redressed by a favorable decision."

Id. at 560-61 (citations omitted) (first quoting Whitmore v.
Arkansas, 495 U.S. 149, 155 (1990), then quoting Simon v.
Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976), then
quoting Simon, 426 U.S. at 38, 43).   While "[t]he party invoking
federal jurisdiction bears the burden of establishing these
elements," the severity of this burden varies depending on the
stage of litigation.   Id. at 561.   "At the pleading stage," for
example, "general factual allegations of injury resulting from
the defendant's conduct may suffice."   Id.

### 1.   Injury in Fact

"[T]here is ordinarily little question" of injury when the
plaintiff is himself the object of the government action he
challenges.   Id. at 561-62.

Here, Crooker alleges that TSA has made a disclosure to a third party that has resulted in a concrete injury to Crooker. See Am. Compl. ¶ 13; Letter from CAA Dep't of Public Safety. He has lost a job, a job that means a lot to him.

### 2.    Causation

The second requirement of standing is "a causal connection between the injury and the conduct complained of." Lujan, 504 U.S. at 560.  That is, Crooker must show "that the injury is fairly traceable to [TSC's] allegedly unlawful actions." Animal Welfare Inst. v. Martin, 623 F.3d 19, 25 (1st Cir. 2010) (quoting Nulankeyutmonen Nkihtaqmikon v. Impson, 503 F.3d 18, 26 (1st Cir. 2007)).

Crooker alleges that but for the TSA disclosure, he would not have lost his job.  It is true that Crooker no longer seeks the relief related to his employment that was included in his original complaint.  He focuses now on removing his name from the No Fly List.  Nevertheless, Crooker alleges he lost his job because of the disclosure, which inferentially suggests that there is a causal connection between the Defendants' actions and Crooker's injury.

### 3.    Redressability

Finally, Crooker must show that "it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. (quoting Impson, 503 F.3d at 26).

This requirement has been held to have been satisfied through requests for injunctive relief.  See, e.g., id.; Strahan v. Coxe, 939 F. Supp. 963, 979 (D. Mass. 1996) (Woodlock, J.), vacated in part on other grounds, 127 F.3d 155 (1st Cir. 1997).

It is here that Crooker's claim for standing is the weakest.  True, he seeks declaratory and injunctive relief, but his claims are so broad as to reach beyond the subject matter jurisdiction of this Court in light of the restrictive review requirement of 49 U.S.C. § 46110.  What this Court **could** do, however (indeed, about all it **can** do), is order that Crooker be treated the same as a person denied boarding an aircraft under the TRIP program.

### D.   Exhaustion of Administrative Remedies

The Defendants argue that before bringing a judicial action, Crooker must first properly exhaust his administrative remedies.

The Supreme Court acknowledges that "parties [ought] exhaust prescribed administrative remedies before seeking relief from the federal courts," as exhaustion "serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency."  McCarthy v. Madigan, 503 U.S. 140, 144-45 (1992), superseded by statute on other grounds, as recognized in Booth v. Churner, 532 U.S. 731, 740 (2001). Moreover, "the exhaustion doctrine recognizes the notion,

grounded in deference to Congress' delegation of authority to
coordinate branches of Government, that agencies, not the
courts, ought to have primary responsibility for the programs
that Congress has charged them to administer." Id. at 145.
Additionally, "exhaustion promotes judicial efficiency in at
least two ways[:] [w]hen an agency has the opportunity to
correct its own errors, a judicial controversy may well be
mooted, . . . [a]nd even where a controversy survives
administrative review, exhaustion of the administrative
procedure may produce a useful record for subsequent judicial
consideration." Id.

"There is very little guidance in any Circuit considering
administrative exhaustion as it pertains to the Redress Program
and there is no case law in [the Sixth] Circuit." Shearson v.
Holder, 725 F.3d 588, 594 (6th Cir. 2013). So it is in the
First Circuit as well.

On the one hand, "when considering the purposes of the
exhaustion doctrine, making [the plaintiff] submit a Traveler
Redress inquiry is reasonable to promote judicial efficiency and
allow the agencies involved an opportunity to resolve problems
with their procedures." Id. On the other hand, "there are no
regulations regarding DHS TRIP that mandate exhaustion."
Mohamed v. Holder, 995 F. Supp. 2d 520, 534 (E.D. Va. 2014)
(noting that 49 U.S.C. §§ 44903(j)(2) and 44926(a) "direct[] DHS

to create a redress program without requiring that travelers take advantage of it").

"[W]here Congress has not clearly required exhaustion, sound judicial discretion governs" whether or not it should be required.  McCarthy, 503 U.S. at 144.  This Court will follow Darby v. Cisneros, 509 U.S. 137 (1993), and rules that where "neither the [relevant] statute nor agency rules specifically mandate exhaustion as a prerequisite to judicial review," id. at 138, this Court has the discretion to require TSC to treat Crooker the same as one who has been denied boarding an aircraft under the TRIP program.  In sum, this Court has subject matter jurisdiction to exercise review under the Administrative Procedure Act ("APA") without first requiring Crooker to purchase a plane ticket, try to board, and wait to see what happens.

Ordering the Defendants to process a TRIP application for Crooker may be all that Crooker can accomplish in this case. Despite the Defendants' arguments and declarations, Decl. Deborah O. Moore ("Moore Decl.") ECF No. 58-1 and Decl. Timothy P. Groh ("Groh Decl.") ECF No. 58-2, this Court believes that granting Crooker such an order is the only just and fair thing for Crooker.  After all, fiat justitia ruat cælum (let justice be done though the heavens fall).  Lord Mansfield in Somerset v. Stewart, 98 ER 499 (1772).

[18]

**E.   Deficiencies of the Current Redress Procedure.**

In his interaction with DHS TRIP, Crooker received an answer stating only that "[a]fter reviewing your inquiry, we have determined that it falls outside the scope of the DHS TRIP program," and TSA jurisdiction.  Am. Compl. ¶¶ 17, 24.  This is not surprising, since Crooker never tried to board a domestic or international flight.  The Defendants point out that any information on the No Fly List is deemed "to be sensitive security information that may not be publicly released."  Defs.' Mem. Dismiss 6 (quoting Napolitano, 700 F.3d at 737 n.5).  Thus they emphasize that they cannot simply respond to every casual inquiry.

The Defendants thus create a Kafkaesque situation -- indeed a potential violation of the Constitution's due process clause.[2] The only available option is to follow the DHS TRIP process, which forces the interested person to be an airline passenger, and only after that person is delayed or denied boarding may he start the whole process of redress.

Other courts have noticed this issue: "There are thousands of people on the government's terrorist watchlists, and there

---

[2] The American Civil Liberties Union has also criticized this process, calling it "grossly insufficient."  Know Your Rights: What to Do If You Think You're on a No-Fly List, ACLU (2018), https://www.aclu.org/know-your-rights/what-do-if-you-think-youre-no-fly-list.

are thousands more people each year whom the government misidentifies as being on the lists." Shearson, 725 F.3d at 595.  Even Deborah O. Moore, the Branch Manager of the Transportation Security Redress Branch in Civil Rights & Civil Liberties, Ombudsman and Traveler Engagement at the TSA, acknowledges the No Fly List's drawbacks: "[a]pproximately 98% of travelers who make redress inquires with DHS TRIP are not in fact in the TSDB."  Moore Decl. at ¶ 6.

Even so, the Defendants argue that allowing Crooker to have his TRIP application processed will open the floodgates to other inquiries and will have a detrimental effect on national security.  The floodgates argument is frequently raised with but vague meaning and few facts to support its sometimes-shaky foundations.  See Marin K. Levy, Judging the Flood of Litigation, 80 U. Chi. L. Rev. 1007, 1007-77 (2013).  So it is here.

This case has a discrete set of alleged facts: the TSA makes a disclosure, Crooker loses his job.  It is nobody's fault.  He's trying to clear his name following government-established procedures.  There may be other analogous cases.  They will come before competent judges who can distinguish those cases from this one.  At the hearing on Crooker's motion to dismiss, this Court inquired about other cases like this one.

There has been no response.  There is nothing to the floodgates argument.

## III. CONCLUSION

For the foregoing reasons, the Court DENIES the Defendants' Motion to Dismiss the Amended Complaint, ECF No. 43, and Motion to Stay the Case Pending Exhaustion of Administrative Remedies, ECF No. 45.  The Court rules that it has a limited area of subject matter jurisdiction here, Crooker has standing, and he need not exhaust any administrative remedy other than submitting a TRIP application.  While the Court has limned a possible remedy should the alleged facts prove true, it is in no position to fashion a remedy absent proof of the alleged facts.  Unless settled, the parties shall be trial ready by October, 2018.

**SO ORDERED.**

_William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE